667 A.2d 166

The **BALTIMORE SUN COMPANY**

v.

**STATE of Maryland et al.**

**No. 35, Sept. Term, 1995.**

Court of Appeals of Maryland.

Nov. 13, 1995.

438

James J. Doyle, III (Mary R. Craig, Doyle & Craig, P.A., on brief), Baltimore, for appellant.

Andrew H. Baida, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General; Ralph S. Tyler, Deputy Attorney General, on brief), Baltimore, Stuart R. Cohen, Legal Aid Bureau, Inc., Baltimore, for appellee.

Argued Before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

MURPHY, Chief Judge.

This case involves the extent to which a juvenile court can limit the media's use of information when that court gives the media access to a previously confidential juvenile proceeding. We hold that while a court can place reasonable restrictions on

the media's use of information obtained in a confidential juvenile proceeding, it cannot limit the media's publication of information which it legitimately collected from other sources, and cannot condition access to the juvenile proceeding upon the media's publication of material specified by the court.

I

This is the second time that issues arising from these proceedings have warranted our review. *See In re Maurice M.*, 314 Md. 391, 550 A.2d 1135 (1988), *rev'd, Maurice M. v. Bouknight*, 493 U.S. 549, 110 S.Ct. 900, 107 L.Ed.2d 992 (1990). In our prior opinion, we set out the facts surrounding this case in detail. *Id.* at 394–97, 550 A.2d 1135. On January 23, 1987, Maurice M., the three-month old son of Jacqueline Bouknight (Bouknight), was admitted to the hospital with a broken leg. Following Maurice M.'s hospitalization, the Baltimore City Department of Social Services (DSS) filed a petition in the Circuit Court for Baltimore City (Division of Juvenile Causes), seeking a determination that Maurice M. was a child in need of assistance under Md.Code (1984) § 3–801(e) *et seq.* of the Courts & Judicial Proceedings Article.

After a hearing on August 18, 1987, and based upon the child's injuries and other indicia of abuse, Maurice M. was placed under an Order of Protective Supervision to the DSS. On April 18, 1988, the DSS filed a petition representing that Bouknight had failed to cooperate with it. The DSS also filed a Motion for Contempt, alleging that when its representatives made a home visit on April 7, 1988, they were told that Maurice "was in the care of an aunt" but that Bouknight refused to identify the aunt or provide the child's whereabouts.

Following a hearing on the contempt motion, Bouknight was arrested and brought before the circuit court (Mitchell, J.). When Bouknight refused to reveal the whereabouts of her son, the court found her in civil contempt and entered an order specifying that Bouknight be jailed until she purged herself of the contempt by producing Maurice M. in court, revealing his

whereabouts to the court, or providing sufficient information about Maurice M. to the court, the DSS, or the police. Bouknight continued to refuse to divulge her son's whereabouts, and remained in jail until this year. After arguments had been heard on the issues now before us, the court released Bouknight from jail subject to her compliance with certain conditions imposed upon her by the court in the exercise of its continuing jurisdiction over the case.

We are not here concerned with the substantive merits of the proceedings regarding Maurice M. Instead, we consider the validity of the conditions under which the court afforded media access to these juvenile proceedings. Prior to January, 1995, the court had determined that Maurice M.'s best interests were served by closing the proceedings to the media.

On January 17, 1995, The Sun, a newspaper published in Baltimore, and other media representatives filed a motion for leave to intervene and for access to proceedings and certain papers filed in Maurice M.'s case. After a hearing, the court entered an order dated January 17, 1995 granting the media access to further proceedings on the condition that "[a]ny reference to the respondent shall not be to his full legal name; reference will be to 'Maurice' or 'Maurice M.'" On January 26, 1995, The Sun published an article containing a computer-enhanced image of Maurice M. with a caption identifying the juvenile as "Maurice Bouknight." The Sun obtained the computer-enhanced photograph from the Baltimore City Police Department. "Maurice Bouknight" is not Maurice M.'s legal name.

Following the article's publication, the court conducted a hearing to determine whether The Sun's publication of the photograph and identification of the child as "Maurice Bouknight" violated the court's January 17 order. The Sun contended that the publication of the photograph was not a violation of the court's order, and that its reference to Maurice M. as "Maurice Bouknight" was inadvertent. The court disagreed, viewing the caption on the photograph as "an attempt to get around the Order by publishing not his legal name, but

a name of identification." It expressed surprise that the police department would release the photograph, stating that "it should know better."

On January 26, 1995, the court proposed to amend its existing order to provide that

the child ... shall only be referred to as Maurice M. or Maurice. The last name of the child shall not be used in any way in publication, either in print or broadcast. No likeness, photograph or visual representation of any kind of the child shall be used or displayed in any news media publications.

The court placed a condition upon its issuance of the amended order by directing that its full text be published in all editions of The Sun on January 27, 1995. The court said that "[a]bsent [publication of the order], frankly, we are prepared to deny your access." When The Sun declined to print the court's proposed order, the court, by order dated January 26, denied the media further access to the case.

The Sun and other media representatives petitioned the court for reconsideration of its January 26 ruling. On February 6, 1995, the court issued a memorandum and order in which it asserted that its original order of January 17 forbade the publication of any "photographic likeness" of Maurice M. The court identified the source of the photograph as the public affairs office of the Baltimore City Police Department, which had decided to distribute the photograph to the media without asking the court's permission. Asserting that "the newspaper cannot obtain succor from the mistake of the Baltimore City Police Department in assuming it had the independent authority to release the photograph," the court entered an order on February 6, 1995 allowing access to the proceedings for all media organizations except The Sun.

The court said its decision to exclude The Sun was "based on [The Sun's] deliberate editorial decision to disregard the order of the court, and its apparent unwillingness to abide by the laws pertaining to confidentiality with respect to juveniles in Maryland." For all members of the media other than The

Sun, the court's February 6 order allowed access to the proceedings on the conditions that "the media shall not print the full legal name of the Respondent, but may refer to him as 'Maurice' or 'Maurice M.' " and that "[n]o likeness, photograph, or visual representation of any kind of the child as presented in court or made an exhibit shall be used or displayed in any news media publication."

The Sun appealed the juvenile court's order to the Court of Special Appeals, asking it to reverse the lower court's denial of access. Before the Court of Special Appeals issued a decision, we issued a writ of certiorari and brought the case to this Court.

Three parties have presented arguments in this case. The Sun contends that the juvenile court has imposed unconstitutional conditions upon media access to the proceedings. It argues that because the February 6 order does not apply to The Sun, the court's January 26 order denying access is still in force. The Sun contends that conditioning further access to the proceedings upon the publication of the court's proposed January 26 order was unconstitutional. In addition, The Sun contends that the conditions placed in both the proposed January 26 order and the February 6 order unconstitutionally restrict the publication of lawfully obtained information. The Sun asks that we reform the court's February 6 order to pass constitutional muster.

The state contends that the court's February 6 order replaced the January 26 order denying access, and that any issues relating to the February 6 order, and the proposed January 26 order that would have allowed conditional access, are moot. It argues that the February 6 order is constitutional and should be upheld. Maurice M., appearing by counsel, argues that the proposed order of January 26 was unconstitutional, but agrees that the February 6 order cured those defects, and that the February 6 order should be upheld. Counsel for Maurice M. stressed that the publicity resulting from media access to the proceedings is most likely to benefit

Maurice M. by aiding the police in determining the minor's whereabouts.

## II

### A

■■ Courts may close juvenile proceedings to the public in instances where closure would be impermissible in other court proceedings. Md.Code (1973, 1995 Repl., 1995 Supp.) § 3–812(e) of the Courts Article provides that in a juvenile proceeding, the court "may exclude the general public from a hearing, and admit only those persons having a direct interest in the proceeding and their representatives." *See also* Md. Rule 910(b) (providing that hearings of juvenile causes "may be conducted out of the presence of all persons except those whose presence is necessary or desirable"). In addition, court records pertaining to juveniles are held in confidence, and can only be divulged by court order, or for limited educational purposes. *See* § 3–828 of the Courts Article; Md.Rule 921(a).

■■ The Sun does not challenge the constitutionality of any of these statutes and rules. Nor does it contend that it has a *right* to attend juvenile proceedings in general, or these proceedings in particular. Therefore, we need only determine whether the court's discretion was properly exercised in this case. Although a juvenile court has the discretion to exclude the press from a juvenile proceeding, its discretion is not unlimited and must be exercised in accord with the purposes for which it was given and within applicable constitutional limitations.

### B

■■ The First Amendment to the United States Constitution provides that "Congress shall make no law ... abridging the freedom ... of the press." The Supreme Court "has interpreted these guarantees to afford special protection against orders that prohibit the publication or broadcast of particular information or commentary—orders that impose a

'previous' or 'prior' restraint on speech." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 556, 96 S.Ct. 2791, 2801, 49 L.Ed.2d 683 (1976). Because "prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights," *id.* at 559, 96 S.Ct. at 2803, any prior restraint bears a heavy presumption against its constitutional validity. *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419, 91 S.Ct. 1575, 1577–78, 29 L.Ed.2d 1 (1971). Before a prior restraint can be deemed constitutional, a court must determine that the magnitude of the danger the restraint seeks to prevent, "discounted by its improbability, justifies such invasion of free speech as is necessary to avoid the danger." *United States v. Dennis*, 183 F.2d 201, 212 (2d Cir.1950) (Hand, J.), *aff'd*, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951), *quoted in Nebraska Press Ass'n, supra*, 427 U.S. at 562, 96 S.Ct. at 2804.

The Supreme Court has conducted such balancing twice in the context of juvenile proceedings. In *Okl. Pub. Co. v. Dist. Court In & For Oklahoma Cty.*, 430 U.S. 308, 97 S.Ct. 1045, 51 L.Ed.2d 355 (1977), the Supreme Court reversed an order issued by a state trial court that enjoined newspapers from publishing the name or picture of a minor child involved in a juvenile proceeding. Even though juvenile hearings were presumptively closed under Oklahoma law, "members of the press were in fact present at the hearing with the full knowledge of the presiding judge, the prosecutor, and the defense counsel.... There is no evidence that petitioner acquired the information unlawfully or even without the State's implicit approval." *Id.* at 311, 97 S.Ct. at 1047. The Court relied on *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 496, 95 S.Ct. 1029, 1046–47, 43 L.Ed.2d 328 (1975), which held that the press may not be prohibited from "truthfully publishing information released to the public in official court records." *Id.* at 496, 95 S.Ct. at 1047.

In *Smith v. Daily Mail Publishing Co.*, 443 U.S. 97, 99 S.Ct. 2667, 61 L.Ed.2d 399 (1979), the Court struck down a statute that made publication of a juvenile's name in connection with juvenile proceedings a criminal offense unless court

approval was obtained before publication. In the Court's view, it was unimportant whether the statute constituted a prior restraint. *Id.* at 101–02, 99 S.Ct. at 2669–70. In summarizing its previous decisions, the Court stated that "if a newspaper lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order." *Id.* at 103, 99 S.Ct. at 2671. Even though previous cases "involved situations where the government itself provided or made possible press access to the information," the Court determined "[t]hat factor is not controlling." *Id.* The Court balanced the state's interest in protecting the juvenile's anonymity against the public interest in press access and "the important rights created by the First Amendment," and found that "the constitutional right must prevail over the state's interest in protecting [the anonymity of] juveniles." *Id.* at 104, 99 S.Ct. at 2671. As a result, "[i]f the information is lawfully obtained, . . . the state may not punish its publication except when necessary to further an interest more substantial than is present here." *Id.*

Although these two cases provide the general principles with which our decision must comply, the Supreme Court has not spoken to the issue of what conditions can be placed upon the media when granting access to an otherwise closed juvenile proceeding. Several state courts have addressed this issue, however, and a rough consensus seems to be emerging.

Courts have generally upheld orders allowing the media to attend juvenile proceedings even if those orders place conditions upon the media's use of confidential information obtained at the proceedings. For example, in *Austin Daily Herald v. Mork,* 507 N.W.2d 854 (Minn.App.1993), the Minnesota Court of Appeals upheld an order permitting media representatives to attend an otherwise closed hearing on the condition that they not reveal the names of any juveniles or other confidential information revealed during the hearing. The court characterized the order as a grant of "limited access" to the hearing, and therefore concluded that it was not a prior

restraint. *Id.* at 856 (relying on the Supreme Court's ruling in *Pell v. Procunier*, 417 U.S. 817, 829–30, 94 S.Ct. 2800, 2807–08, 41 L.Ed.2d 495 (1974), that limiting media access to information does not constitute a prior restraint). The court specifically noted that "[t]he trial court has not restrained the media from publishing information already in their possession about the juveniles or information the media might later obtain from other sources." *Id.*

The conclusion reached in *Mork* is in accord with that reached by other courts. *See In re Minor*, 149 Ill.2d 247, 172 Ill.Dec. 382, 382–85, 595 N.E.2d 1052, 1053–55 (Ill.1992) (upholding an order that allowed access to a juvenile proceeding only if media representatives signed a pledge not to reveal the juvenile's name, and distinguishing cases where the identity of the juvenile was publicly revealed or obtained through routine reportorial techniques); *State in Interest of H.N.*, 267 N.J.Super. 596, 632 A.2d 537 (1993) (upholding order to the extent that it limited media use of information originating at the confidential juvenile proceeding); *Edward A. Sherman Pub. Co. v. Goldberg*, 443 A.2d 1252, 1259 (R.I.1982) (allowing the trial judge to order the media not to publish the name of a juvenile if the name was obtained from a judicial source); *Matter of Hughes Cty. Action No. JUV 90–3*, 452 N.W.2d 128 (S.D.1990) (allowing exclusion of media after "the media indicated that it would not preserve confidential information obtained at the juvenile proceedings if it were allowed to have access to such proceedings," and not finding it unconstitutional that the trial judge would have allowed access on the condition that the minor's identity not be revealed).

On the other hand, judicial orders have been found unconstitutional when they reach beyond confidential information revealed in the juvenile proceeding and restrain media representatives attending the proceeding from publishing information that was obtained through otherwise lawful investigation. For example, the Supreme Court of Rhode Island in *Edward A. Sherman Pub. Co., supra*, 443 A.2d at 1257–59, examined an order that granted access to a juvenile hearing but prohibited attending media representatives from revealing a juvenile's

name. This order was upheld *only* to the extent that the name had not been lawfully obtained from non-judicial sources. The court stated that

if ... the media have learned the name of the juvenile from non-judicial sources, as a result of their own investigations or under similar circumstances, the trial justice shall permit the representatives of the media to report, publish, or make public the name of such juvenile and shall permit the representatives of the media to attend the hearing or proceeding in the Family Court.

*Id.* at 1259; *see also id.* at 1257 (finding that the "portion of the order conditioning petitioners' attendance at other juvenile proceedings upon their agreeing in advance not to publish the name of the juvenile is impermissibly overbroad, as well as an unconstitutional prior restraint on the press").

Other courts have reached similar conclusions. *See San Bernardino County Dept. of Public Social Services v. Superior Court*, 232 Cal.App.3d 188, 283 Cal.Rptr. 332 (1991) (vacating an order granting access to a proceeding only upon compliance with a number of conditions because "apparently a significant reason ... the juvenile court decided to allow [the newspaper] to attend the proceedings was the court's misguided belief that allowing the press admittance would somehow afford the court an avenue through which it could control the publicity surrounding this case"); *In re A Minor*, 127 Ill.2d 247, 130 Ill.Dec. 225, 537 N.E.2d 292 (1989) (vacating orders prohibiting a newspaper from publishing a juvenile's name and barring it from the courtroom if the name were to be published, when the newspaper legally obtained the name "through lawful and 'routine' newspaper reporting techniques"); *cf. State in Interest of H.N., supra,* 632 A.2d at 538–39 (vacating order enjoining newspaper from printing identifying information obtained from public sources, but not directly dealing with the issue of conditional access to juvenile proceedings).

One court seems to disagree with this approach. *Matter of Hughes Cty. Action No. JUV 90–3,* 452 N.W.2d 128 (S.D.1990), upheld a court order closing a juvenile proceeding. Before

entering this order, the trial court had offered to open the proceeding to the media on the condition that they not publish "the names, pictures, place of residence or identity of any parties involved." *Id.* at 130. When the media refused to accept this offer, the court closed the proceeding. *Id.* The South Dakota Supreme Court found that the trial court's action was constitutional, specifically noting that closure of the proceedings "in no way prohibited or restrained the media from publishing any information with respect to this matter." *Id.* at 134. The court noted that there was no court order that restricted the media from publishing any lawfully obtained information. *Id.* In the court's mind, closure of the proceedings was not used as a means of punishing the media, but simply to protect the minors' confidentiality when the media had stated that they would not protect that confidentiality themselves. In that court's view, "such conditional access was offered merely as an alternative to a totally closed adjudicatory hearing. . . . We will not condemn the trial court merely for attempting to provide an alternative. . . ." *Id.*

■ Given the posture of *Matter of Hughes Cty. Action No. JUV 90–3,* however, the court may have distinguished between a *court order* granting access only upon the condition that the media not publish information that was otherwise legally obtained and a situation where a court will only grant media access if the media *agree* not to publish such information, and then closes the proceeding to the media if the information is published or the media will not agree. The existence of a court order could be considered more egregious because "a speaker's defiance of a judicial order can place the speaker in contempt even if his speech is ultimately held to be protected." *In re A Minor, supra,* 130 Ill.Dec. at 233, 537 N.E.2d at 300 (citing *Walker v. City of Birmingham,* 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967)). This may be a distinction without a difference, however, because a court that requires media representatives to "promise" not to print information lawfully obtained from other sources achieves the same result as a court that orders the media not to publish such information. Regardless of the reasoning behind *Matter of Hughes*

*Cty. Action No. JUV 90–3, supra,* we agree with the majority of courts that have considered this issue. A court cannot order the media to refrain from publishing material lawfully obtained from sources outside of the judicial proceeding as a condition of granting access to a juvenile proceeding.

## C

This case also requires us to determine whether or when the press can be *required* by a court to print specific material. The Supreme Court has addressed this question outside of the context of conditional access to juvenile proceedings. In *Miami Herald Publishing Company v. Tornillo,* 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974), a statute was found unconstitutional when it gave political candidates a right to reply to newspaper articles and required the newspaper to print such replies. The Supreme Court held that

> any such compulsion to publish that which "reason" tells [the editor] should not be published is unconstitutional. A responsible press is an undoubtedly desirable goal, but press responsibility is not mandated by the Constitution and like many other virtues it cannot be legislated.

*Id.* at 256, 94 S.Ct. at 2839 (quotation omitted). Thus, the right-of-reply statute constituted an "intrusion into the function of editors," and "[t]he choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials ... constitute the exercise of editorial control and judgment." *Id.* at 258, 94 S.Ct. at 2840.

■ The Supreme Court, therefore, has not distinguished between governmental actions restraining publication and those requiring publication. Either situation requires an interference with the editorial process. We conclude that a judicial order conditioning access to a juvenile proceeding upon the required publication of specific material is unconstitutional to the same extent as an order conditioning access upon a restraint from publication.

### III

Before we examine the constitutionality of the juvenile court's actions, we must first determine the proper scope of our review. The court's February 6 order specifically denies The Sun further access to the juvenile proceedings, while allowing access by other members of the media upon certain conditions. The state and counsel for Maurice M. assert that this order makes the constitutionality of all previous orders or proposed orders moot. As we earlier observed, however, Bouknight's release from jail was not without conditions, and is subject to the court's continuing jurisdiction. The case is not, therefore, mooted by Bouknight's release.

"A question is moot if, at the time it is before the court, there is no longer an existing controversy between the parties, so that there is no longer any effective remedy which the court can provide." *Attorney Gen. v. A.A. School Bus,* 286 Md. 324, 327, 407 A.2d 749 (1979). Even when a case is moot, however, this court has the constitutional authority to express its views on the merits of the case. *Mercy Hosp. v. Jackson,* 306 Md. 556, 562, 510 A.2d 562 (1986). This authority is only to be exercised "in rare instances which demonstrate the most compelling of circumstances." *Reyes v. Prince George's County,* 281 Md. 279, 291–99, 380 A.2d 12 (1977). We need not determine whether this case presents one of those "rare instances," however, because Bouknight's release from prison has not eliminated the possibility of future proceedings in the case of Maurice M. The juvenile court's order still bars The Sun from attending those proceedings, and limits the material that can be published by other media representatives. For this reason, the constitutionality of the February 6 order is not a moot issue.

In addition, we must review the court's actions prior to the February 6 order insofar as is necessary to evaluate whether the February 6 order's exclusion of The Sun was justified. The juvenile court must have a basis for treating The Sun differently from other members of the media. To determine whether this basis exists, and whether the basis is sufficient to

justify The Sun's exclusion, we must examine the actions of the parties and the juvenile court prior to February 6. We will examine each of the relevant orders and proposed orders in turn to the extent that they impact upon our review of the February 6 order.

*The January 17 order and its "violation."* In its February 6 order, the court justified excluding The Sun by referring to The Sun's violation of the January 17 order. The court was incorrect, however, to treat The Sun's publication of the enhanced photograph on January 26 as a violation of its January 17 order. We find nothing in that order relating to the publication of photographs or other likenesses. The court chose to grant access upon the specific condition that the media not use Maurice M.'s full legal name. If the court sought to protect all confidential identifying information, it could have so worded its order. *See State in Interest of H.N., supra,* 632 A.2d at 538 (reviewing an order limiting the use of "name, address, date of birth, photos, and any other identifying data"). The state is wrong to contend that the "spirit" of the January 17 order forbids the publication of any identifying information. The Sun and other media representatives were entitled to rely on the actual words used by the court in determining whether their actions are in compliance with the court's order.

The Sun did not actually violate the provision of the order forbidding it from publishing Maurice M.'s legal name. The Sun identified Maurice M. as "Maurice Bouknight." Maurice M.'s name is *not* "Maurice Bouknight." The Sun therefore only violated the provision of the order requiring The Sun to refer to Maurice M. as " 'Maurice' or 'Maurice M.' " To the extent that the January 17 order required The Sun or other media representatives to use specific terms in referring to Maurice M., the January 17 order is unconstitutional. Under *Tornillo, supra,* 418 U.S. at 258, 94 S.Ct. at 2839–40, the press cannot be required to publish specific material. Although the state has an interest in protecting Maurice M.'s privacy, this interest does not justify forcing the

press to use a specific term when referring to the juvenile. Therefore, the court could not constitutionally impose a condition requiring the press to refer to Maurice M. by a specific name.[1]

 The Sun, however, did not challenge the constitutionality of the January 17 order at the time, and did violate one of the provisions in that order. *See Walker v. City of Birmingham,* 388 U.S. 307, 318–21, 87 S.Ct. 1824, 1830–32, 18 L.Ed.2d 1210 (1967) (stating that those who believed a court order to be unconstitutional "could not bypass orderly judicial review of [the order] before disobeying it"). In addition, The Sun concedes that it committed a "technical" violation of the order. In its later deliberations with regard to media access to Maurice M's case, therefore, the juvenile court could appropriately consider The Sun's reference to Maurice M. as "Maurice Bouknight."

 *The proposed January 26 order.* The court's statements on January 26 make it clear that had The Sun consented to publish the court's order in all editions of its newspaper, the court would have entered an order giving The Sun continued access to the proceedings. Had The Sun consented to the court's request, therefore, the February 6 order specifically denying The Sun access to the proceedings would never have been entered and The Sun would currently have access to the proceedings. It is therefore appropriate to review whether it was proper for the court to condition its proposed order in this manner.

 It was improper for the court to condition further access to the juvenile proceedings upon The Sun's publication of a court order. Numerous courts have held that in exercising its discretion to close juvenile proceedings, a court must weigh the state's interest in protecting the anonymity of

---

1. We note that the February 6 order provides that media representatives "may" refer to Maurice M. as " 'Maurice' or 'Maurice M.' " This construction does not require the media to use any particular term and is therefore appropriate.

juveniles against the First Amendment interests of the public and media. *See, e.g., San Bernardino County Dept. of Public Social Services, supra*, 283 Cal.Rptr. at 332; *Florida Pub. Co. v. Morgan*, 253 Ga. 467, 322 S.E.2d 233, 238 (1984); *Associated Press v. Bradshaw*, 410 N.W.2d 577, 580 (S.D.1987). Thus, any order restraining or requiring the publication of specific material is only justified if the interest in protecting juveniles' anonymity outweighs the interests of the press and public in the proceedings and the press's right of editorial control.

It is difficult to understand how publication of the court's order would have advanced the state's interest in protecting Maurice M.'s identity. The court's stated justification for requiring publication of its order as a condition for continued access was that it was not able to disseminate the order as broadly as it would like. The court, however, had other mechanisms at its disposal for making such orders known to members of the media in attendance at the juvenile proceeding.[2] The publication of the order imposing further restrictions on the media could only draw attention to The Sun's story from the day before and the offending reference to Maurice M. as "Maurice Bouknight." We fail to see how Maurice M.'s interest in anonymity would be enhanced in any appreciable manner by requiring the publication of the proposed order.

Had there been no violation of the January 17 order, it would have been unconstitutional to condition access to a proceeding upon the publication of a court order. *See supra* section II.C. It is possible that a state interest may be sufficient to condition future access to closed proceedings upon the publication of specific material when a member of the press has violated a previous court order. It is conceivable that a circumstance exists where the damage caused by the violation of the court order could be "cured" by publishing

---

**2.** We could find no other case in which a juvenile court attempted to condition access to the proceedings upon the publication of a court order. Thus, other juvenile courts seem to have been able to impose restrictions protecting the confidentiality of information without interfering with the editorial processes of the attending media.

specific material. Even if such a case exists and such an order would be constitutional, however, The Sun's publication of the proposed court order in this case would in no way repair any damage done to Maurice M.'s anonymity.[3]

*The February 6 order.* The February 6 order both excludes The Sun from further attendance at the proceedings and imposes conditions on other members of the media in return for access to the proceedings. The Sun's technical violation of the January 17 order's unconstitutional provision is insufficient to justify excluding it from future proceedings, and The Sun should be given access on the same basis as other members of the press. In addition, the conditions imposed upon all members of the media can only extend as far as confidential information obtained from the juvenile proceedings. For this reason, we shall vacate the February 6 order, leaving it to the juvenile court, in the exercise of its continuing jurisdiction, to determine whether a new order is necessary for any further proceedings.

The juvenile court appears to have considered The Sun's publication of the photograph when determining that The Sun should be denied further access. As earlier noted, publication of the photograph did not violate the court's January 17 order and cannot provide a basis for sanctioning The Sun for its publication. The only violation committed by The Sun was to refer to Maurice M. as "Maurice Bouknight." In

---

3. One might question whether the juvenile court actually sought to protect Maurice M.'s identity by requiring the publication of the order. There is no relation between the court's stated goal of having its order circulated and requiring that the order's publication be "similar" to the publication of the photograph that the court found offensive. To the extent that the publication of the order was intended to punish the Sun rather than to further the legitimate interest in protecting the identity of a minor, it was clearly improper to condition further access to the proceedings upon the publication of such an order. The courts have no authority to coerce a newspaper into making any sort of public admission of "complicity." In *Tornillo*, 418 U.S. at 256, 94 S.Ct. at 2839, the Supreme Court noted that "press responsibility is not mandated by the Constitution and like many other virtues it cannot be legislated." Nor can it be judicially imposed.

determining whether this violation of the court's order justifies excluding The Sun from further proceedings, the court must consider the magnitude of the violation, the harm caused by the violation, and the purposes that would be served by allowing The Sun to have further access to the proceedings.

The Sun's violation of the January 17 order was relatively insignificant. The record does not disclose any evidence to support the juvenile court's conclusion that the caption on the photograph was an intentional violation of the court's order. In addition, the provision of the order violated by The Sun was not only unconstitutional, but does not, as we see it, further the interests served by the order. Maurice M.'s anonymity is clearly protected by the provision preventing the media from using his full legal name. This cannot be said for the provision requiring the media to use specific terms when referring to him.

The Sun's violation of the January 17 order did not, therefore, impair Maurice M.'s anonymity. It is publicly known that Maurice M.'s mother is named Jacqueline Bouknight, and the story accompanying the photograph of Michael M. prominently referred to his mother's last name. For anyone attempting to discover the identity of Maurice M., "Maurice Bouknight" is an obvious possibility. In addition, to the extent that The Sun's caption convinced anyone that Maurice M. was named Maurice Bouknight, that person would be even farther from knowing Maurice M.'s true name than before the publication of the article.

We note that both the Baltimore City Police Department and counsel representing Maurice M. have determined that publicity is in the child's best interest. The Sun obtained the photograph of Maurice M. after the police department decided that releasing it could improve the chances of finding the child. Counsel for Maurice M. claims that it is in Maurice M.'s best interest to give The Sun access under the same conditions imposed on other media representatives. While neither of these views is binding upon the juvenile court, it may well be that Maurice M.'s best interests would be *en-*

*hanced* by allowing The Sun to report on the court's attempt to discover his whereabouts.

The Sun's reference to "Maurice Bouknight" did not harm Maurice M.'s interest in privacy, was not an intentional violation of the order, and was within The Sun's rights under the First Amendment. The juvenile court itself was willing to allow The Sun to continue its attendance at the trial, upon The Sun's acceptance of a condition that would have done nothing to protect Maurice M.'s anonymity. The juvenile court abused its discretion in excluding The Sun while allowing other media representatives to attend the proceedings.

██ To the extent that the February 6 order regulates the publication of material obtained from sources other than the juvenile court, it is unconstitutional under the First Amendment. The state and Maurice M. argue that the juvenile court had no intention of extending the reach of its order to cover material obtained from independent sources. Given the juvenile court's actions with regard to the photograph obtained from the Baltimore City Police Department, this argument is not persuasive. If the juvenile court determines that a new order is needed for any future proceedings in the case of Maurice M., any orders granting access to the proceedings should only impose conditions related to the use of information obtained in those proceedings.

*ORDER OF THE CIRCUIT COURT FOR BALTIMORE CITY DATED FEBRUARY 6, 1995 VACATED; CASE RE-MANDED TO THAT COURT FOR SUCH FURTHER AC-TION AS THE COURT MAY DEEM APPROPRIATE CON-SISTENT WITH THIS OPINION; COSTS TO BE PAID BY RESPONDENT.*